The final case for argument this morning is 23-1190, ACLR v. United States. Okay, Mr. Bonello. Ready? Whenever you are. Good morning, Your Honors. John Bonello on behalf of the appellant, ACLR, LLC. This case is an appeal of the Court of Federal Claims rulings on the motions for summary judgment. The ultimate issue in this case is whether a retroactive constructive termination for convenience can be applied given the underlying facts in this case. Can you just outline for me at the outset what the issues are because I'm confused. Either because of waiver or because some things were ruled on in some word. So you've got the constructive termination issue. Yes. The bad faith breach of contract is only preserved with respect to the 2007 audit. Is that correct on that? And the 2010 plan year audit. You've applied, you've appealed? Yes. So what we're asking for is, there's the two audits at issue. There's the plan year 2007 audit. And are those implicated both on the case involving the constructive termination and the breach of contract? Yes. I thought you had only appealed. But anyway, I'll ask the government about that. And then where are we with respect to damages? What's appealed? What's preserved? We're seeking obviously a reversal on the breach of contract with respect to the 2007 duplicate payment audit. And then we ask for damages. Can you stop there because that's what I was trying to get to. I did understand that. I didn't understand that you were also appealing the breach of contract on the 2010. Yes, we are. But for that, we're simply seeking a reversal on that. Not necessarily a ruling in our favor on that. We think that should be remanded for consideration. All right. Anyway, on damages then, you're seeking what? We're seeking 7.5% of the $313 million that ACLR identified in duplicate payments for plan year 2007. Anything beyond that? What if you lose on that? If we lose on that, then we'd be seeking the percentage on the... But we would have a remand on the 2010 duplicate payment audit. So we'd be proving up what our damages would be on that for a breach of contract or a breach of duty of good faith and fair deal. And what about... Sorry to make it more complicated. On 2007, if you don't win on the termination point, are you seeking a remand for the termination of the reasonable costs resulting from the termination on 2007? Yes. Yes, we would. So that's an issue before us. You're not seeking a remand on that. You're seeking a reversal, I guess. The Court of Federal Claims judge ruled on that. Yes. Yes. The Court of Federal Claims ruled on... So once you get past the breach of contract and duty of good faith and fair dealing, then you get into the cost issue. As we stand here before the Court, there's been nothing awarded for ACLR's work on the 2007 and 2010 duplicate payment. Well, I thought there had been some adjudication and it was a conclusion that you only proved up like $159,000 or $157,000 and everything else was rejected. That was the contracting officers on our claim. They said on the 2010 audit, ACLR was entitled to approximately $157,000. That was... We then proceed because we didn't agree with the contracting officer's determination. Those and the contracting officer rejected all damages. What did the Court of Federal Claims do with that? The Court of Federal Claims, we then, we filed a motion for summary judgment. Did they give you that $159,000 or they didn't give you anything? They denied our motion for summary judgment. And then as we were proceeding to trial, the Court of Federal Claims offered the government opportunity to file a motion for summary judgment on the standard record-keeping system. ACLR, in response to the motion, articulated these are what we believe is our standard record-keeping system. So we had filed a motion for summary judgment. Did you preserve an argument that if you lost on what you were seeking, you still wanted the $159,000? I don't recall. I don't recall if that argument was specifically made or not. Okay. Well, it's the nature of this case that it took us five minutes just to divine what the issues were. But please proceed. Right. It's an extremely complex case because of all the variety of motions that have transpired. But in a nutshell, what prompted this all is the Affordable Care Act's requirement. We understand the history. So let's start with the 2007 audit. Why is it not? I mean, the government realizes that there's the system, this PWS or whatever it's called. You come to the government. You say you want to do this. And they say, no, don't do it. Right. ACLR was prepared to issue the letters to the plan sponsors that would recoup the funds. That was in November. And they were not allowed to tell you not to do it or they had to have a reason to tell you not to do it? There were 20 audits during this five-year period, and you performed seven. I guess 11 you didn't perform, but they're not an issue either. So the issue is only these two. These two are an issue, although I'd respectfully say that, in fact, there was only three audits that were approved. When we grouped them by years, sure, there's a few more audits. But in terms of specific audits on issues like duplicate payments, it's three. How many employees does ACLR have? I'm sorry? How many employees were working on these audits? I believe in the beginning, I couldn't say a number, but there was, again, I think it was in the range of 15 to 20 in the beginning in the first year. And then that was cut back and then ultimately scaled back because And were these employees working at the same time on a variety of audits or were there particular employees assigned for the duration of one audit to that audit? In the beginning, if we talk about what happened in 2011 for the plan year 2007 duplicate payment audit, the focus was to pursue the duplicate payment audit. So I would say, although there was development of infrastructure and other things, you need to have security systems, et cetera, in place. So you had like 20 people working on this one audit? I think that was about the range. You spent a week, came to the government saying, we want to issue demand letters and the government said, wait off, don't do it. We don't want you to do it. And then you proceeded to do it anyway. And then the audit was never completed. But because you came up with a number of $333 million or whatever it was, you're seeking in this case 7.5% as a contingency fee for that entire amount? Correct. And just to elaborate on that. After the government had already told you not to seek it. They had told us in November of 2011 they didn't want the letters issued to the plan sponsors. Those letters would issue, then they would say we want the repayment, the recruitment of the overpayments. Do you think the government was entitled to tell you not to go forward with these letters? No, I don't believe so. I believe the performance work statement, which outlined the structure of the recovery audit contract and provided that duplicate payments could be pursued. So ACLR had the opportunity. That was the basis of the bargain. Isn't that why the court then found it was a termination for convenience? Because the government clearly, when they did this, when they said whatever, let's just assume they had a problem with what you're doing, you probably have a different characterization. But if they come and look and say we don't want to go forward with this contract, the government has the right to terminate for convenience, right? It has a right to terminate for convenience. In this situation, it's a little bit unique. No, no. But if they had come in officially when they said don't do this audit and issued a document that says we're terminating this for convenience, they could have. Correct. And you could have sought T for C costs. Correct, yes. And what the Court of Federal Claims did is looked at this and said this is functionally a termination for convenience, so T for C costs. What's wrong with that? Because the underlying facts show that there was no intent by the government to honor that PWS, to honor that Part D contract. So you would have to prove under those circumstances that there was some bad faith. That there was bad faith, that there was no intent to honor that contract. Okay, and the Court of Federal Claims found that you didn't meet your burden on bad faith. I think if I read the Court of Federal Claims decision correctly, what it was saying was there was changed circumstances that would justify the application of a retroactive construction policy. I mean, isn't a T for C not honoring the contract? Where's the line between choosing not to honor the contract and choosing to not go forward with it because circumstances have changed? I mean, that's what the government said here is enough that we don't want you to do this. We have issues with this, so stop. Correct. And that seems to be borne out by the fact that you were working under this PWS and the government was having problems with it, and in fact they subsequently turned to this SOW, whatever these acronyms mean, and you agreed to that. And so going forward, there was an agreement by the parties that the SOW was the appropriate way to proceed, right? I think that the retroactive constructive termination for convenience runs back to 2011. So I know the government's raised the argument that, well, you've now done away with the PWS and for some reason that therefore justifies the PWS was never in effect. That's not true. You have to look at course. Well, the PWS was certainly in effect because they accepted it. Maybe they accepted it unwisely, but once they accept it and then they look at it and say, oh, we didn't mean this is wrong. We don't want to go forward with that. Why is that bad faith per se? Isn't that just a recognition of the government that this is not the way it wanted the contract to proceed? I think there's a distinction between saying there's something we don't want to do this. Then they could have effected at that point in time a termination for convenience. They did. They didn't do a formal termination for convenience, but they told you stop these audits. We don't want these letters to go out. That's what they did, yes, but they didn't terminate the contract. They said don't. That's why it's a constructive termination for convenience rather than an actual termination for convenience. Well, we didn't have the opportunity. The court disregarded the fact that the government wasn't going to honor the contract. If they're saying- I understand that you keep saying the government is going to honor the contract. That's what happens when the government terminates a contract for convenience. They're saying we're not going to honor the contract. We're terminating it. They have that right. In regular contract law, maybe that doesn't happen, but the government has the right, and your right is to seek allocable costs that you incurred up to the date of that termination for convenience, isn't it? Well, this is the issue here and why it's unique. And, again, the constructive termination for convenience is an issue made doctrine. So what we have here is nine years later the court coming in and saying we're going to have a retroactive constructive termination for convenience. ACLR said why don't you terminate the contract? And then at that point in time, in 2011, they could have recovered their costs. Will you continue to do other contracts after this 2007? Obviously, you did the 2010, but also, right? We were still on board. You agreed to do this new thing, this SOW, change of circumstances, that you agreed to. But let me ask you, going back to the damages because we can't spend all morning here, so first off, you're seeking, even though there was never any recoupment of payment, and after one week the government stopped you before you even should have sent out the demand letters, you're seeking like $23 million, which is what you say is 7.5% of the amount that the government could have recouped if it had gone forward. Correct. Okay, I assume you have a backup plan for that, and that backup plan was that you're entitled to at least the damages incurred until, assuming there's a constructive termination. Your alternative would be what? The damages that you incurred up until the termination, the constructive termination? Correct, and some of those lingered on because there wasn't an ability to adjust because we had to employ staff, etc., but be that as it may, yes. I assume that's true because didn't you put in for the head of your organization over 3,000 hours for that one week of work? We did. You put in for 3,000 hours for one individual? We did put in time for individuals that worked. Did you put in 3,023 hours for one individual? I believe we did, yes. That couldn't have all been incurred the week before the government told you to stop? Our position is that from the award of the contract in January of 2011 up until the time of approximately November of 2011, and then some lingering costs all relate to that duplicate payment audit because if there's a constructive termination for convenience, that essentially ends the contract. That's what we're talking about. That duplicate payment audit was ended. What was the work done covering in those 3,000 hours? The work that was done was once you're awarded the contract, you have to set up. First of all, you have to do hiring. We hired people. You have to put forth the infrastructure. These are PDEs. They're prescription drug records. You have to have a secure infrastructure. Do you have documents showing this person spent all this time on the 2007 audit? What we can do because it's nine years later, we have to go back now. It could have probably been done a lot easier if it had happened in 2011. Aren't you required to keep adequate cost systems under all these federal procurement contracts? Not in a contingency fee contract, but we have. We're not required. But you are if you're going to show termination for convenience costs. We can show the cost that we incurred, but the standard that was articulated in the Court of Federal Claims ruling was that we needed to essentially have something that tracked the exact amount of time to the particular task. Well, is that what's required for termination for convenience costs? No, it's not. You don't have to have specific time tracking for that argument. I thought that the Court of Federal Claims just said you need some method of contemporaneously tracking costs in a regular, organized manner. Do you have any problem with that standard? We thought we had presented sufficient evidence because we've got our W-2s. Those don't have a problem with that standard, right? I just think you meant it. No, I have a problem with it because I think what that sentence holds and then what the actual ruling is, is that you needed to track specific time to a specific task. And looking nine years back, when you have a contingency fee contract, which doesn't require you to do that, if that was a rationale that's applied to fixed-fee contracts, that means all fixed-fee contracts, small businesses have to put in place... It did have a... So you knew you were bearing a risk that you might end up in the termination for convenience. Particularly when the government told you to stop work and not send out the demand letters after one week. So if you were going to ask for 3,000 hours, if you were spending 3,000 hours in connection with that one 2007 contract with respect to one individual, don't you think some sort of verification or validation would have been required? I mean, I think that might be the normal course and we're dealing here with auditors. I mean, I think auditors are really good at tracking stuff. Presumably that's why your client was hiring you in the first place. What we did was, again, we had... When we presented this to the court, we said, we have W-2s for the people that worked on this audit. We have estimates of time from the principle of ACR. We have accounting records which reflect the costs that were incurred. We have a host of information. What the court did was to say, again, you don't have specific time records for specific tasks. Therefore, we're not going to accept that. I think it was reacting to the stuff that you were putting in for. For example, you were asking for 3,000 hours for this one individual for a contract that was constructively terminated one week after it began. I think you asked for 5,000 hours for a contract that went on quite a while, right? The 2010 audit. So those numbers. And then at some point you put in payment for the lease for the entire four-year period, I think. Wasn't that one of your requests for payment? That was, yes. Okay, so don't you have to- Sorry. I mean, don't you have to- I mean, you worked on however many audits. You stayed confident, but there were more than these two audits because these two audits you didn't get paid for, and you made $3.4 million in this four-year period, right? And your contingency fees. So you must have done something else. So why would the entire cost of the lease for the entire period be allocated to the 2007 contract, which you were working on for a week? Because what transpired was you have the contracts awarded. ACLR does an assessment. Okay, this is what we need to do. Remember, the amount of estimated overpayments in the year of 2007 was $2.4 billion. So this is an enormous undertaking to analyze and recoup these overpayments. So what they do then is they secure a lease for property so that they could have a secure facility to handle the technology and the- What you just said is that the lease should at least be allocated. 2007 and 2010 didn't count for whatever billion dollars you just mentioned. So isn't there some sort of allocation required? I mean, I don't think in this case we have to define a standard for standardized recordkeeping. I just think under any standard, it's not clear to me that the information you submitted to try to recoup reasonable expenses was sufficient, however standard recordkeeping necessity was applied. What we did was the government had challenged, as we were proceeding to trial, the government said, you can't prove anything with respect to your cause. And we said, we can. We have a tremendous amount of records. And we have testimony from the individual- And you do have about 100,000 pages of records, right? Because again, the challenge by the government was you don't have anything. I think their challenge was you don't have a standard recordkeeping system. And when you dumped 100,000 pages on the court, the court agreed. It's not the court's job and it's not the government's job to figure out how to take these however many years of receipts you have and divide them up for two different contract years and exclude the costs that would have been allocable to the stuff you've completed. We were prepared to present that at trial. But you didn't. And where is there any evidence before the summary judgment motion that you could do that? But we did. We did. We put that- Where's the table that shows this guy spent 3,000 hours on the 2007 contract? We have tables of the time. They're in exhibits to- Does it show something contemporaneously that he actually devoted 3,000 hours to the 2007 contract? It shows- We can prove that because we can put him on the witness stand. No, no, no. Do you have something that you gave to the court sufficient to create a triable issue of fact that those 3,000 hours were entirely attributable to the 2007 contract? Or do you just have W-2s and time and attendance records for the entire period? We have that information and we have his emails to show what he was doing, what he was working on. We have his testimony. All that was ignored. The court said, I don't like your standard record-keeping system. You have to have some generic record-keeping system. The statute says it's standard record-keeping. I don't think it's a very high burden. And I think it's required in almost all these cases that if you're going to recover termination for convenience costs that the costs have to be allocable to the specific contract. And if you're claiming employee hours, you have to have things showing this person worked X hours on this contract. And you didn't have that, did you? I believe we have the opportunity to present that on a motion for summary judgment. We can't just throw stuff up and say, we're going to prove it at trial. That's what you have to create a triable issue of fact. Did you submit an affidavit? We did. We submitted an affidavit by this week. And did he describe what the timeframes were and what the work he was doing during those timeframes that added up to over 3,000 hours? In connection with the motion for summary judgment. In connection with one of the motions for summary judgment, yes. Did that declaration say, I spent all 3,000 of these hours on the 2007 and 2011 contracts or wherever you were trying to allocate them? I don't recall. I believe it was. But again, we have... You have to show that. You can't just generally say, I worked a lot. No, that was the intent. What did the declaration say? I'm not going to belabor this because you clearly don't know the answer to what his declaration says or don't want to tell us that it didn't say, I worked 3,000 hours on the 2007 contract. And during the time period before the government terminated. I think there's a clarification on that point. The government's position is, you only did the 2011 audit for a couple of weeks and that's it. I was talking about 2007. Right. The government's position, I believe, is you only did the 2007 duplicate payment audit for a couple of weeks. That's not accurate. The duplicate payment audit starts with when the contract was awarded. The performance work statement says, we're going to pursue duplicate payments. So to start the infrastructure, to start the analysis that goes into doing that, it begins in January, February of 2011. This is where the 3,000 hours come from. I started this in January and I spent however many hours a week doing this. It's not a one week thing as a government. But is that for just the 2007 time period or is that the startup time period for all the potential option years going forward? Because it's the same thing with the lease. If he's doing general work that's going to be useful for the entirety of the contract, then you can't allocate it all to one year. You have to spread it out and allocate it across the several years, just like you have to allocate the lease across the several years instead of just dumping it into the first year. I think given that you have the court enacting a retroactive constructive termination for convenience, that argument is not getting you anywhere with me because if you have a termination for convenience clause in your contract, you're on notice that the government can terminate it and there are certain legal standards you have to meet to recover T4C costs. Those include having an accounting system where you can determine that the costs are properly allocated. The fact that it was done nine years later doesn't excuse you of not having an appropriate accounting system from the start. Is that the law? I would say we did have an appropriate standard record keeping system from the start that could show the costs that were incurred. How about the lease? How do you justify the lease? The lease costs for the entire period where you were working on 20 different audits and we pluck out two audits, one of which never was stopped after one week, and you're attributing all of your rental payments to those two contracts as a reasonable cost? First, I would just say there was only three audit issues that were allowed to proceed. Not 12 or 20, there was three. Yes, but did you allocate any of the portion of the lease to the ones that were allowed to proceed or are you seeking it all under these T4C clauses? We're seeking it all because once the change, once it was clear that we weren't going to be able to pursue the duplicate payments, we had already locked in that lease. We then sought change in... We then sublet and got smaller... That sounds like damages, not T4C costs. All right. Going back to T4C, the law allows you to rebut that if you can show bad faith by the government. I think you're arguing or are you arguing that you adduced enough information, enough evidence that a reasonable fact finder could have found that the government acted in bad faith? Is that one of your arguments? Yes, it is. Can you just briefly summarize for me what that evidence is? Sure. We believe there's uncontroverted evidence that the government had no intent to honor the contract with respect to the 2007 Plan Your Duplicate Payment audit. So we have... The evidence is... There's an email in the record from July of 2011. CMS is going before Congress to testify about the Part D RAC contract. They're getting ready for the congressional testimony and they say there's no payments in the first... There's going to be no payments. They're internally talking. What else do you have? We have the hiring of the other contractor, Booz Allen Hamilton, that was engaged in January of 2011. Is it your contention it's reasonable to assume they were going to just pay Booz Allen and never pay you? No, that inhibited our ability to proceed because they were saying, we're having Booz Allen go ahead and implement the Part D RAC contract. The performance work statement was already in place that set forth, here's what we're going to do, here's the process we're going to use... So again, is the contention it would be reasonable to infer that they were only going to pay Booz Allen and not pay you to do this work? That they weren't going to allow us to proceed. When did they hire Booz Allen? It was at least as early as January of 2011. And what else besides the email and the hiring of Booz Allen? We have the contracting officer's representative telling ACLR in November of 2011... Don't go forward. Right. Don't go forward, but also saying the performance work statement is a proposal, it's not a contract. It is. It's not. The performance work statement is part of the contract. Anything else? And then we have Cynthia Moreno, who's a division director for the program integrity, testified that ACLR would not be able to recover improper payments or collect fees until the program had been implemented in a manner that was satisfactory to CMS. But the fact of the matter is, it was already implemented through the performance work statement. That's it, though, right? Just those four pieces of evidence? I can go on with a couple more, if Your Honor would like to hear them. Do you think you've set it out in the brief? Anything else? I think it's set out in the brief. And I would say that in a motion for summary judgment, all the deference is given to the non-movement. We had moved for summary judgment, but then the government also moved for summary judgment. So the court's got to evaluate, in considering the government's motion for summary judgment, whether there's absolutely no evidence that would support a bad faith or an abuse of discretion. It's whether, taking it all in the light and most bearable to you, a reasonable fact finder could find clear and convincing evidence of the government's bad faith. That's the analysis, correct? That's our argument on our motion for summary judgment. No, no. That's your argument in opposition to their. Your argument on your summary judgment motion is a reasonable fact finder could only find clear and convincing evidence of bad faith. And our argument in response to theirs is you have to take our evidence in the light most favorable to the non-movement, which would preclude the summary judgment entry for the government. That was it. Thank you. Thank you. Good morning. May it please the Court. In this case, in granting summary judgment for the government, the trial court appropriately held first that the agency's cancellation   The trial court held that the agency's cancellation of two audits based upon the T4C clause in the contract. Second. Why did you accept the PWS for the 2007 if you weren't going to let them do it? I'm sorry, Your Honor? Why did you accept the PWS for the 2007 if you weren't going to let them do it? Because, I mean, accepting it forms a contract, right? Yes. So the PWS at that time, this would have been in January 2011. Are there facts suggesting that you knew you weren't going to let them do it when you accepted the PWS? Well, the PWS was drafted by ACLR. And as ACLR admits in its opening brief in footnote four, they do not disagree that CMS had concerns with the workability of the PWS. That's why I'm asking why you accepted it, if you had concerns. I mean, really, the ideal time to change the PWS is before you enter into a contract. That may be so, Your Honor. In retrospect, what occurred in fact here was, as it started early on under the contract, there were problems with the workability of the PWS. From the government's point of view, ACLR, having drafted this, did not understand some of the methodologies. But the two sides negotiated and came up with a replacement, which was the statement of work, the SOW. So after you accepted it and formed the contract, you realized that it wasn't going to work? That is correct. Is there evidence, any evidence showing that you knew it wasn't going to work before you accepted it? No, I'm not aware of that. But in terms of the Court's decision, the Court looked at this and looked at the arguments back and forth and noted these disagreements. But in effect, what's undisputed is that by bilateral modification, executed by both ACLR and the government, they replaced the PWS with the SOW. Well, in your brief, you say in the first year of contract performance, CMS found the PWS unworkable and sought to revise it. And then you cite pages in the appendix. Do you recall what those pages tell us? Because I've got too many volumes to find it right at this moment. Yeah, it's quite detailed. But from the government's perspective, there were problems with methodologies. One of the big problems with the PWS was that it was ambiguous and not clear on granting approval to perform an audit. That was later clarified in the statement of work that CMS had to approve an audit before it could be undertaken by the contractor. That was one of the things that was not clear in the PWS. Why is there not a triable issue of fact on whether the government acted here with bad faith or intent to harm? Well, what the trial court decided was that there's no dispute that CMS canceled the 2007 audit on November 30, 2011, during a conference call, and ACLR's words have killed the audit. And because of the questionable circumstances, the trial court held that this was a constructive termination for convenience. Why is there not a disputed fact as to whether or not they rebutted the availability of the termination for convenience defense by inducing sufficient evidence that the government was actually acting in bad faith? And where does the trial court analyze that question? Well, ACLR didn't actually argue bad faith. What they argued was, as they did this morning, that the government had no intent to honor the contract, which is... Well, that would be a form of bad faith, wouldn't it? To enter into a contract with no intent... Yeah, that's the Torn Cellar case. That's really belied by the facts in this case that, in fact... In fact, if at the time they entered into the contract, they had no intention of performing it, then that might be bad faith. The government, if the government had that intent, right? Yes. That would be... The answer to that is, yes, it could possibly be evidence of bad faith. If they knew at the time, if the government knew at the time it entered into the contract that it actually wasn't going to let them perform it, that could be bad faith. Is there any evidence that they pointed to that construed in their favor suggests that? Or is all of their evidence after the PWS was awarded, and it all suggests it arises from the problems the government had once they finally sat down and did their due diligence and read the PWS? That's correct. There's nothing they pointed to that the government had no intent to honor that. It turned out once they got started, it was not workable. They came up with an alternative. And in this case, this was a partial termination for convenience. Only two audits, but ACLR... I'm not clear where they're coming up with three. They performed seven. This is noted by the court. The contract was extended. Options were exercised. The base year was one year. They performed for four years. They worked on seven audits. They were paid over $3 million. There is no bad faith. Secondly, in the three decisions that the court issued, the last one, the trial court correctly held that ACLR failed to satisfy the requirements of the termination for convenience clause for 52.214-4L because it lacked a standard record keeping system,  That is, ACLR lacked a regular organized method for tracking relevant cost resulting from the two audits. ACLR, by its own admission, a self-professed, highly experienced accounting firm, did not contemporaneously track its cost. This is in the affidavit of Mr. Muck. Is that... I mean, I guess one of their answers might be that these were contingency fees. So when you've got a contingency fee contract, it's not like your regular lawyer having to bill your hours and keep track of your hours. I'm not saying that I accept that, but that would be one of the arguments about that. Yes. That is correct. Under the contingency fee contract as a deliverable, they were not obligated to track their labor hours. But as Judge Hughes raised the point, if they're seeking termination for convenience costs, they were required to track their hours. Well, I would also think that somebody's got to track something because they're paying employees. I don't know what their payment schedule was, if employees were getting a percentage of the contingency fee, and that was the payment. Right. I suspect maybe these were salaried employees or hourly employees that were getting paid. I don't know. That is correct. And just one thing to point... If they were paid on an hourly basis... I don't believe... Mr. Muck, their CEO, in his affidavit, stated that he did not take a salary. As for the employees, the records that reflect they received wages and had taxes deducted were the W-2s. The problem with those W-2s, I think they reflected some aid employees, and they claimed for the entire year of 2011, even though the 2007 audit started on the outside when CMS issued an e-mail on August 25th, 2011, to ACLR inviting them to propose... Actually, it was two audits. The duplicate payment audit and the excluded provider audit, and then ACLR started receiving PDE records from CMS on November 17th, 2011, and then it was terminated on November 30th. So at most it's three months or less than two weeks, but yet they're claiming the entire year. So your point is that all they gave you was W-2s showing what these employees earned, but no statement that you should allocate a quarter of this to the contract or all of it because it's all the hours, even though it was for one tax year for the contract. There's no way to break it down. There's no way to break it down, and, in fact, they don't reflect the two audits, and, in fact, underlying this case, ACLR was working on multiple things. The trial court made findings that ACLR was working on the task order, which was common to all of the audits. As I pointed out... Did they get paid for that task order? They... No, they didn't get paid for the task order. They got paid for completed approved audits when improper payments are collected, only when they're collected. And for these two audits, ACLR identified improper payments, but their contingency fee clause makes clear... So that other task order, if they've been working under that task order, why shouldn't they get to allocate some of those costs to the 2007 and 2000... Is it 10? Whatever we're talking about, if they were fairly in support of it. Well, first of all, ACLR never claimed that. And the specific findings of the court, ACLR claimed that, in 2011, they only worked on the 2007 audit. That was a disputed fact, and the court said, that's just a bare assertion. Unless it's backed up with records from a standard record-keeping system, that's not a finding we can make on summary judgment. So... In sum, ACLR had... They have no records. No documents showing... The amicus makes reference to FAR 12.403, which provides that a contractor may rely on its standard record-keeping system to demonstrate reasonable charges. Yes. Is that pertinent here? It is not, for several reasons. First, that's an argument made by amicus, not by ACLR specifically. Well, I'm concerned about it. Why should I not be concerned? Well, first of all, FAR 12.403 is guidance on the T4C clause, and 12.403 is not in the contract. The provisions that's in the contract is the actual FAR clause, and it does not use the word may. So clearly it's a... So that guidance has no applicability if you put the other provision in the contract itself? That is correct. So what is the government's position on what was required to be maintained in terms of records? And how is the contractor supposed to know that if it's not in the contract? So we believe that the trial court appropriately interpreted the regulation using dictionary definitions for the term standard, denoting a measure of commonest regularity, system indicating orderliness and organization, and held in sum that a standard record-keeping system is a regular, organized method for tracking relevant costs, relevant to a particular project, doesn't have to be complicated, doesn't have to be sophisticated, and they failed to do that. And this is reflected by their trial exhibits, by their evidence. So with ACLR, one can just look at any... It doesn't have to just be one kind of sophisticated accounting system, right? It just has to be something that shows we incurred this cost, whether it's wages, lease, paper clips, whatever, and this is how much it was, and it is attributed to this contract. Correct. If they have that, that's a record-keeping system. Correct. It does not have to be a particular form. And the problem here is they have a lot of receipts and W-2s and stuff showing how much money they spent out, but at least as far as I can tell, there's nothing that connects those costs with contemporary evidence to the specific two years we're talking about. Not so much as a single document that we could find. They included receipts for flowers, for groceries, for alcohol, for gun ammunition. That is what their record-keeping produced. Can I talk to you about settlement costs? Do you read the trial court opinions as saying settlement costs to the extent that was part of the reasonable cost that they were trying to recover under the termination for convenience, that the lack of record-keeping is the reason there is no longer a triable issue of fact as to the amount of their settlement costs? Because that was not at all clear to me from what the Court of Federal Claims was saying. Well, in terms of... If we're talking about the last decision... Right. Because before that last decision, the trial court made clear there's a dispute of fact and we're going to trial. And then after you move for summary judgment again, suddenly there's no disputes of fact, no trial. But I don't know if settlement costs got any attention there and if I'm supposed to understand that the reason there's no longer a dispute of fact about settlement costs in particular is the lack of record-keeping. Yeah. Really, the third decision didn't focus on settlement costs per se. The prior decision, like termination for convenience claim proposal cost is something that they could have got. They just... They presented 168 pages of legal bill. They just never broke that down. But in terms of the last decision, what the court held was that the trial court set out several factors for them to meet and it was the second one that ACLR failed to prove an essential element of the case, that proving reasonable costs comports with the legal requirement of the regulation. So they just failed to meet the regulation. That was the whole thing. So that holding extends to the settlement costs? Yes. Okay. To all claim costs. Thank you. Subject to any further questions of the court, we respectfully request that the court affirm the decision of the trial court. Thank you. Thank you. We'll give you three minutes. Okay, thank you. A couple of quick points. We had some discussion about Mr. Muck's time. That's at Appendix 5914, which is an allocation of his 3,000 hours over 2011 up until January of 2012. So when did the government tell you not to go forward with the... That was November of 2011. So he's... And his 3,000 hours that you're seeking go for another year? No, they go up to January of 2012, so another month and a half approximately. And that was 3,000 hours in a month and a half or two months then? That was 3,000 hours from January of 2011 until January of 2012. So that's over a one-year time span was the 3,000 hours. When was the PWS awarded? January of 2011. And when was the 2007 audit... That took place. ...inaugurated? We believe it was... Our position is it was right at the beginning of the contract. The performance work statement said we're going to pursue duplicate payments. So as part of what... That was the only thing they were pursuing at that time. It was in 2012. When did they... And they told you not to do any more in November of 2011? Right, in November of 2011 is when the government says... And their view is that the records were sufficient to show that from January through... January to January he spent this much time and that it was all allocable to the 2007 audit... audit of the 2007 year. I can't say... I think the way to look at it is you have to do certain things in order to have an audit of PDE records. So they're setting up the infrastructure. They're doing a variety of things. You have to do some analysis. Well, that's a problem for you because this is not a single-year audit. This is a program that's going to have option years. So what he's doing in preparation can't be allocated to just one option year. It has to be allocated to all the option years that were performed. But the... I think if you're going to say the contract... This is basic accounting principles about how you allocate costs. I think it's a little bit... Sorry, I'm going to let you finish as soon as I finish. I mean, it's the same with the lease. You don't get to allocate all the costs to the first year of a multi-year contract. They have to be spread... The fixed costs have to be spread out over the lifetime of the contract, don't they? I think from a legal scenario when you impose a retroactive constructive termination for a community and say, November 2011, you are done with this, that once they're done, they can recover those costs. Even if you said, okay, we can allocate over a period of time, that would instill in title ACLR to some cost. That's the other point I wanted to raise. On page 9 of the government's brief, it has a chart which reflects the three... the audit issues that were allowed. There's really three audit issues. It's excluded providers, unauthorized prescribers, and scheduled refills. There was three audits. The total of those recoveries were $18.7 million over a five-year span. ACLR, in terms of its expenses that it incurred, even if you said, what were your expenses over the whole five years of the contract, were significantly more than the $3.3 million that it received under the contingency fee contract. But nobody said you couldn't recover them if you properly documented them. The basis is you didn't properly document them. From the Court of Federal Claims' perspective, which said you need to track your time by the task and by the hour. If you want to impose that standard, that's a very challenging standard for a lot of contractors who have fixed-fee contracts or contingency-fee contracts. I'll note that in the Court's decision, it says... Do you have any precedent that says you don't have to do that to justify T4C costs? We had... I think the case law in our briefs supports that, that you don't have to have a specific system. No, that's not the question I just asked. The statute 52... The question I asked was not did you have to have a specific system. The question I asked was in a T4C claim where you have to show costs, is there any precedent to show that you don't have to allocate them by whatever you're seeking, whether it's hours or lease costs or something? You don't have to show that they were actually incurred with regard to a specific contract? I think we were precluded from even doing that because what we had was... No, that's not the answer. Is there any precedent that that's not what T4C requires? Isn't that what a T4C claim requires? You would have to show what the costs were and how they were allocated to a certain contract. I think we have evidence that would show that. Where does the Court of Federal Claims say that you need to allocate specific time, specific employee to a specific contract? Where is that in the decision? It's the decision or argument. I don't want your argument. I want to know where the trial court held what you just told me it held. I think that's the only conclusion you could gather from that. Isn't it? Okay, fine. Thank you. I thank both sides. The case is submitted. That concludes our proceedings this morning.